My name is Barry Kirshner. May it please the Court, I'd like to reserve three minutes for rebuttal. Let's start with what is not disputed or admitted in the record. Hartford acknowledges at the excerpt of Record 149 and 150 that within its own administrative record, it acknowledges that it's dealing with an own-occupation policy up to the age of 65 from my client, Dr. Alan Hamilton. Hartford acknowledges at the administrative level that Dr. Hamilton cannot perform his regular occupation of neurosurgery. That's at 195 of the excerpt of Record. Hartford acknowledges... I thought his occupation was as a professor. The title of his work and the title of what he calls it is professor. That's correct. His regular occupation and his specialty occupation is the EDMS... He is continuing to get paid as a professor, right? He receives funds... He was or is chairman of the department? He was. He's no longer chairman of the department. Right, but it's an academic position. That's right. It's an academic position which has as part of its key function the performance of surgery and the overseeing of the performance of surgeons. The policy has... Is the argument that he's no longer going to be able to perform his academic duties because he can't perform surgery? Is that the claim? He can no longer perform his academic duties regarding neurosurgery and being in neurosurgery, his clinical duties, and therefore he cannot perform his duties of the occupation that he had with university physicians. So why are they paying him? Why is the university paying him? The university is paying him because he has some tenure as a result of his... The fact that the organization that he was employed by, university physicians, has a relationship with the University of Arizona. So that even though Dr. Hamilton is not able to perform any clinical duties, not able to perform anymore with UPH, that basically work was arranged for him to oversee a research project which has nothing to do with his clinical responsibilities. In the policy at issue, Your Honor, which is I believe at page... He retains his title, right? He retains a title of associate. He's still a professor. That's correct. He's still doing professorial duties and he's still getting paid substantially more than 20% of his earlier pay. That's right. The professorial duties that he is doing... I don't understand why you're here. Well, professorial duties that he is doing have nothing to do with a clinical practice. The specialty occupation that is defined in his policy, which says if you are a physician, that your occupation is the ABMS, the American Board of Medical Specialties, subspecialty occupation. And what we are dealing with is a custom and usage in the insurance industry, which recognizes the significance of specialty occupations. The other thing which is in the record, page 216 and 218 of the excerpt of record, is that the custom and tradition long held in the insurance industry is that for specialty occupations, if the doctor or the professional, it also applies to trial lawyers, is unable to perform the regular occupation, the specialty occupation that is protected, that earnings from the non-specialty do not get attributed to his post-disability situation. Hartford could have said, no, that's not the standard in the industry. That's not the way the policies have been sold for 20 or 30 years. Hartford could have said, our expert witness got that wrong. Hartford could have said, the custom and usage in the industry is something that we don't recognize. It didn't. The record is silent with the exception of our expert witness, Mary Fuller, saying, that as long as the practice in the industry, the custom and usage, where you're dealing with specialty occupations, that earnings outside the specialty occupation field post-disability do not get attributed to the policy, to how the claims are justified. The language of the contract say, though? The contract has one of the --. Is that the critical thing and not the expert's testimony? The contract obviously is a critical thing, but the contract and words in the contract are words which are given context by the meaning, including the custom and usage of the industry. Essentially, what has happened is the one undefined word of earning has trumped all of the indicia that there is a specialty occupation here. The language of your occupation, defining your occupation as if you are a physician, your specialty occupation is the specialty or subspecialty, that means something. If this were not an own-occupation policy, that language wouldn't be there. There are other indicia of specialty occupation. One thing also which is clear, Hartford, if it wants, when it wants, it can define a term as it did in this contract, CME, current monthly earnings, to include your and any occupation and your earnings from any occupation and from any employer. If you look at page 195 of the excerpt of record, that is a defined term within the contract. That defined term of current monthly earnings at page 255 is in the contract. It applies to residual disability in the contract at page 260, but it does not apply, Your Honors, to total disability. So there has been a concern. Hartford knows how to write a policy which will obliterate the idea of the custom and usage of the trade, of the specialty occupation. Why do you say that the current monthly earnings definition does not apply? Because it is not, it is, if you look at the residual disability, the text in the defined term residual disability in the contract, which I believe is at page 260 of the, either 260 or 261, excuse me, of the excerpt of record. The residual disability refers to current monthly earnings. The total disability does not. The total disability refers to the word earning, an undefined term. So what we have is Hartford, when it chooses, it knows how to write a contract which says, when we're talking about earnings, we're talking about everything. The contract says monthly earnings you receive from any employer for any work while disabled or eligible for residual disability benefits. That's the current monthly? Why isn't it everything he's earning in his professorship job? Your Honor, I believe, Your Honor, correct me if I'm wrong, I believe that you are reciting the definition of current monthly earnings. Yes. And what I'm saying is if you turn the page to, I believe it's 261 of the record, where you are, where we are dealing with total disability, the definitions of Hartford do not include. I don't see it on 261. Excuse me one moment. The excerpt of record at page 260, the bottom definition, starts with total disability and it carries over to the top of 261. If you look at the structure of the definition of total disability and the structure of the definition of residual disability, one starts at page 259 and carries to 260, the other starts at 260 and carries to 261. The structure of both clauses starts out the same way. It lists about five reasons why you may be medically disabled. Then when it goes to residual disability, it says it uses the terms from your or any occupation and it uses the terms and as a result your current monthly earnings are at least a certain percentage. Current monthly earnings is a defined term, which includes the earnings from any occupation and any employer. If we go to the parallel site, which appears at the very top of page 261 of the record, again now we're dealing with the total disability definition, which starts with the recitation of five different reasons, medical reasons why someone might not be able to perform. When it comes to the total disability definition, it says your occupation, not your or any occupation, and it says as a result you are earning less than 20% of your pre-disability earnings. So there is a difference in the selection of words. In the residual disability definition, Hartford has chosen to use a defined term, current monthly earnings. Within that defined term, it specifies that the earnings from any occupation counts, any job, any employer, any occupation. What does it say that he is a physician? At 261, the bottom definition at 261 begins with if you are a physician. Yes. What does it say that he is a physician? There's no dispute that Dr. Hamilton is a board certified neurosurgeon. It's many places. That's not what I'm asking. Where in the contract does it say that he is a physician? I mean, he does many things. He is an M.D., so he is a physician, but he's also an academic, and he earns money from that. Where in the contract does it say? Your Honor, this is a group contract with United Physicians Incorporated. The contract applies to many persons, some of whom are physicians and some of whom are not physicians. So the key language at 261 is if you are a physician, because within the group, subject to this contract, are people who are physicians and people who are not physicians. So when it says at 261, defining you or your occupation, if you are a physician, that it refers — that it deals with the specialty or subspecialty of which you practice from the age — It says who is eligible for coverage. I'm reading from page 230. It says all active full-time physicians, basic scientists, and senior administrators who are citizens or residents. Now, why isn't your client a senior administrator? He was head of the department, right? Well, yes, he did things other than just be a surgeon and perform in the clinic. That's true. But I think the specific of the last page, if you are a physician, your own occupation is, that specific should really trump the general, that there's no question that Dr. Hamilton is a doctor. He is a physician. If he is a physician, then the definition of his occupation in this contract is a defined term, which says that his occupation is the specialty or subspecialty defined, recognized — Is there any question that he can't perform his duties as a clinical physician? No. Hartford conceded. Oh, they conceded that? Yes. At the administrative level — They're questioning the income. Well, it — And that can be income from any source whatsoever. And that is the issue, Your Honor. Basically, what they are saying is that what is recognized as an own occupation, specialty occupation policy, contrary to the custom and usage and the tradition of the industry and the testimony about that — Anything in the contract that says anything about the custom and usage of the industry. The custom and usage of the industry has one person — there's one person addressing that, and that's at page 216 and 218. It's the expert witness, Mary Fuller. And there's an extensive portion of my brief reciting restatements and how words have meaning in context and the custom and usage does. Your Honor, I'm almost — I guess that would only come up if you feel that the language is ambiguous, right? No. The ambiguity question is a question of context. There are words, as described in the case out of Hawaii and in the restatement itself, there may be specific words which in and of themselves appear clear, but in the context do not. If we're dealing with a — Then there's an ambiguity. Well, the context is important. In order to decide whether there's an ambiguity, it's important to know the context in which the words are spoken. And I'd like to reserve some time, although it looks like I'm almost out. You have negative 17 seconds. We'll hear from the other side. Good morning, Your Honors. I'm Bruce Celebrezzi for Hartford Life, an accident and insurance company, and may it please the Court. The plan here, as is very clear, provides income protection for Dr. Hamilton. It is not an investment vehicle for Dr. Hamilton, and it does not do that which he is asking, what he asked the district court and was asking this court to do, is pay him more than he was earning before he was injured. And the plan itself is very clear on this, and Hartford, as the claim administrator, was mandated by 29 U.S.C. 1104 to apply the plan, and that's exactly what it did. The plan says — we have to start with what benefits are payable in the plan, and this is in the excerpt of record at 234. You will be paid a monthly benefit if you become disabled while insured under this plan. And disabled is a defined term on 255, and disabled means either totally disabled or residually disabled. There's two ways a person can be disabled. And counsel is focusing exclusively on total disability, which is also defined at 260 and 261, as you are totally disabled if you are prevented by accidental bodily injury from performing the essential duties of your own occupation, and as a result, you are earning less than 20 percent of your predisability earnings. So in one sentence, the definition of total disability has two prongs, and an applicant such as Dr. Hamilton has to meet both prongs. He's got to show that he was prevented by accidental bodily injury, and here he fell off a horse, so he meets that, from performing the essential duties of his occupation, and that's your occupation, a defined term. And if he establishes that, then he still has to establish that he did not earn more than 20 percent more after his injury than he earned before. And counsel is correct. No one has ever disagreed that this contract defines your occupation as the subspecialty, and it's also true that in the administrative process, Hartford agreed that his subspecialty was being a neurosurgeon. So he did meet the first prong of the test. Accidental bodily injury, he couldn't perform his occupation as a neurosurgeon. But the record is clear, and no one disputes, that he was earning after his injury way more than 20 percent than he was before. And the — He should pay some of it back. I'm sorry? He should pay some of it to the insurance company. Well, no, because this is why this plan is very beneficial to him. And the suggestion in the briefing that this so-called expert talking about this illusory coverage is just such a head-scratcher for us. What this contract provides for Dr. Hamilton is, under the first prong and the second, if he cannot perform neurosurgery and has no income, he can earn 66 and two-thirds of his former earnings. That's what the contract would pay. So he was making $23,000 or $24,000 a month. Under this policy, under total disability, he would get $15,800 a month if he could not perform neurosurgery and was not earning any income. And in addition, he could earn up to 20 percent. He could earn 19.999 percent doing something.  So he could be making about $20,400 a month and still be totally disabled under this plan because of the definition of your occupation being limited to his subspecialty of neurosurgery. They say, oh, that's no benefit at all because we're considering his earnings that he earned as a professor and that he earned teaching the medical students at the university. But if we did not have in this contract the definition of your occupation being so specialized in neurosurgery, then he wouldn't even meet the first prong of the test. Well, let's say he, but what if, you know, I guess how much do you pursue from this standpoint? It sounds to me like that it would encourage people not to work, all right? So if he just could be a Walmart grader, then he could get more money, right? No, he would only get 66 and two-thirds if he couldn't. With this, well, first of all, Your Honor, if we did not have this definition of your occupation, clearly he could still be a physician. He just can't operate. Under his contract with the university, he needed to do clinical work, but nowhere does it say he's not capable of being a physician. Clearly he could still be a professor. Clearly he could still be a fundraiser. Clearly he could still be an administrator. Well, he didn't try to do any of those things. If he just said, I don't, if I can't do what I want, you know, I'm just going to. Would you require, is there some requirement that people have to show that they're trying to get another job? Not in this contract. This is why when they suggest this is not a beneficial contract, this is extremely beneficial. But what it does do, because he could earn, he could be paid by Hartford if he can't do neurosurgery and he just stayed at home. He could be getting a check for $15,800 a month. What does that add up to annually? Well, because he was making. He was making $312,000 before, it's 66 and two-thirds. So, but then as a professor at the end, wasn't he making $179,000 or something? Right. But what he's arguing for, Your Honor, is the following. Oh, he wants the $179,000 plus the 66%. Correct. So what he's saying is. What I'm saying, if he didn't go to work at all, wouldn't, is the 66%, that seems like it would be a little more than the $179,000, right? If he just sat home. It sounds like it's about the same. It's two-thirds of $300,000. But we're talking, we're missing a critical component of the policy, which is, as I mentioned earlier, disabled has two portions to it. It's totally or residually disabled. There is no question that this plan encourages people such as Dr. Hamilton to go back to work. It definitely wants to incentivize people to go back to work because under the residual disability, he could earn from any occupation, as was pointed out, up to 80% of what he was earning before. And the contract still pays benefits. So he really, as long as he was earning 80% or less, he could get additional benefits. And so he could earn up to 100% of what he was earning before. So he is incentivized to work. Okay. Let me ask you this. Apparently, there was an error at, I mean, we have to look at, I think that the appellant is arguing that we review this de novo because of a conflict and you're saying it's abuse of discretion, right? Correct. But I think that, you know, the Supreme Court in Glenn says it's abuse of discretion. I think we win even if it's de novo. Okay. What about there was an error that was determined at some point. You sent him a check for $133,000. As residual disability benefits, which he sent back. And he sent back. Was there a condition on if he cashed that, that he had to, was that? No. Like sometimes you get something, you know, right after you have an accident, your insurance company sends you $500 and says, you know, before your neck starts bothering you and all of those type of things. Well, hopefully that doesn't happen too often, Your Honor. But, no, there were no conditions attached. And I assume.  If he loses here, he's still entitled to residual disability benefits if he complies. In other words, if the medical, because this is three years old, if the medical condition is still the same and if his income is the same, the company would just apply the various formulas in the contract. And if he's eligible for residual, he's eligible for residual. He clearly is not eligible for total. And clearly this contract does not ensure what is really a moral hazard, and that's what he's asking from this Court. Because he was making $23,000 before, and what he's saying is, and the record shows that subsequently he's making $15,000, $16,000 a month, depending on the month, and he wants $15,000 from Hartford. So what he's saying is that because I cannot perform neurosurgery, but I can otherwise work and be a very, obviously a very intelligent man, a very educated man, lots of experience, I can be a productive member of society, that I should earn $10,000 a month more after I was injured than I did before. That is a moral hazard. That is not what this plan says. It would make no sense for this plan to say it. He had, he could get 66 and two-thirds by doing nothing. He can be, he's incentivized to work and get 100 percent, again, for a period of time depending on the formulas in the policy of what he earned before. He is not entitled to 150 percent of what he earned before because he had the misfortune of falling off of a horse. And because of the strategic decision or whatever stunt it was to send the $133,000 back, the only issue before the district court was, was he entitled to total disability or not, and the answer was no, and that should be affirmed. That's the only issue before this Court. Thank you. Thank you, Your Honors. You are out of time. We'll give you a minute for rebuttal if you choose to take it. I'm sorry, Your Honor. I didn't hear what you just said. A minute for rebuttal if you choose to take it. I'm giving you a minute. Okay. Because you're actually over time. Okay. Your Honor, in the insurance industry, there is an animal described as specialty occupation, own occupation. It's referred to as the specialty occupation. You know, that says you've got to not only stop being able to do your occupation, but also stop earning income. The income, there is relevance between the earning definition, or what is characterized as earnings in the industry, and the custom and usage. The custom and usage in the trade, as described by our expert witness, and you can take a look at the Hammond case where the Seventh Circuit judge described the same thing. There's also in the record a judge from our former Supreme Court chief, Stanley Fellman. For specialty occupations, these have been marketed to say that if you cannot perform your specialty occupation, you get the benefits even though you can earn money from other occupations. But that's not what the contract says. Your Honor, the contract uses the word earning for total disability contrary to the way it used current monthly earnings and residual disability. The custom and ‑‑ when Congress passed ERISA, it did not wipe out the hundred years or however many years of insurance law. ERISA incorporates the underlying concepts of insurance terms and usage of the industry, and among the important terms of the industry. What does ERISA have to do with this policy? The policy is governed by ERISA, Your Honor. This is a ‑‑ It's governed by what's written in the contract. Well, the defendant, okay, Hartford believes it's entitled to deference, which we don't believe, but ERISA applies deference to it as a fiduciary in connection with ‑‑ Is that where you're getting custom and practice in the industry is from ERISA? No, it is not. What I'm saying is that ERISA did not erase the custom and usage of the industry. We get the custom and usage of the industry from the industry expert, and the absence of the denial from Hartford that that testimony is accurate, the absence of cooperation from Hartford saying this is why we did what we did, and this is why custom and usage doesn't apply, this is why specialty occupation doesn't apply. And, in fact, internally within Hartford's administrative record, it acknowledges that it has its own occupation policy. Okay. I believe my time is up, Your Honor. Thank you.
judges: Archer, Kozinski, Callahan